
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

IN THE MATTER OF THE APPLICATION ）
OF THE UNITED STATES OF AMERICA ）
FOR AN ORDER AUTHORIZING ）
THE INTERCEPTION OF WIRE ）
COMMUNICATIONS ）

No. 3:20-MC-5005

**TO BE FILED UNDER SEAL**

## <u>AFFIDAVIT IN SUPPORT OF APPLICATION</u>

I, Steffan Hollifield, a Task Force Officer ("TFO") with United States Federal Bureau of Investigation ("FBI"), and being duly sworn, depose and state as follows:

1.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.      I have been a TFO with the FBI since June of 2019. I am also a Detective with Sevier County Sheriff's office, where I have worked in law enforcement since joining the Sheriff's department in August of 2016. I have received training in, and conducted numerous investigations into, controlled substance distribution, including cocaine, methamphetamine, and other illegal narcotics. That experience in drug trafficking investigations includes working on wiretaps of drug trafficking organizations, traffic stops, search warrant executions, interviewing confidential sources and defendants.

3.      Based on my training, experience, discussions with other law enforcement agents, and my participation in other investigations involving quantities of controlled substances, including cocaine and other controlled substances, I know the following:

1

a. the methods in which smugglers and drug traffickers conduct their business, including but not limited to their methods of importing and distributing drugs;

b. their use of conveyances in the conduct of their business;

c. their use of cellular telephones ("cell phones") and other cellular communication devices;

d. their use of numerical codes and code words to conduct their transactions;

e. methods of laundering drug proceeds;

f. smugglers and drug traffickers oftentimes use cell phones to communicate about their drug trafficking activities (via telephone calls and / or text messaging) and that they oftentimes use the cell phones to take photographs of their drugs, drug proceeds, and/or stash locations;

g. smugglers and drug traffickers oftentimes conceal drugs and/or drug proceeds in vehicles to avoid law enforcement detection when transporting drugs and/or drug proceeds.

## I. Definitions

### Target Phones

4.     A cellular telephone bearing the number 865-237-6764, International Mobile Subscriber Identity ("IMSI") 310240130838305 subscribed to by "Juan Lopez, P.O Box 15955 Lenexa, KS, 66285," and believed to be used by Juan Lopez ("LOPEZ"), which is hereinafter referred to as the "TARGET TELEPHONE." The TARGET TELEPHONE is serviced by T-Mobile.

### Target Subjects

5.     Juan Lopez ("LOPEZ"), Alex Martinez ("MARTINEZ"), Mario Antonio Garcia Collantes ("MARIO"), Marcos Ramirez ("RAMIREZ"), Marco Tulio Barralaga ("TULIO"), FNU LNU

2

a/k/a "Jobani," ("JOBANI"), Nolvia Carrillo ("NOLVIA"), and others as yet unknown, hereinafter collectively the "TARGET SUBJECTS."

**Target Interceptees[1]**

6.     LOPEZ, MARTINEZ, MARIO, RAMIREZ, TULIO, JOBANI, NOLVIA, and others yet unknown, hereinafter collectively the "TARGET INTERCEPTEES."

**Target Offenses**

7.     Offenses enumerated in 18 U.S.C. § 2516, that is, offenses involving violations of:

a.  Distribution and possession with intent to distribute controlled substances, including cocaine, and the conspiracy to distribute and to possess with intent to distribute controlled substances, including cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846;

b.  Use of a communications facility to commit, cause and facilitate drug trafficking activity, in violation of 21 U.S.C. § 843(b);

c.  Maintaining a premises for manufacture, distribution, or use of controlled substances, in violation of 21 U.S.C. § 856;

d.  Conducting or attempting to conduct financial transactions with the proceeds of a specified unlawful activity with the intent to promote the specified unlawful activity or to conceal or disguise the proceeds, and the conspiracy to conduct or to attempt to conduct such financial transactions, in violation of 18 U.S.C. §§ 1956(a)(1) and 1956(h); and

---

[1] The TARGET INTERCEPTEES are the subset of the TARGET SUBJECTS expected to be intercepted over the TARGET TELEPHONE.

3

e. Aiding, abetting, counseling, commanding, inducing, or procuring the commission of any of the above offenses against the United States, in violation of 18 U.S.C. § 2,[2] hereinafter all collectively the "TARGET OFFENSES."

## II. **Purpose of the Affidavit**

8.     This Affidavit is being submitted in support of an application for an order authorizing the interception of wire communications over the TARGET TELEPHONE, concerning violations of the TARGET OFFENSES, for a period of thirty (30) days measured from the earlier of the day on which law enforcement officers first begin to conduct an interception under this Order or ten (10) days after the Order is entered.

9.     The authorization given is intended to apply not only to the target telephone number listed above, but also to any other telephone number or telephone accessed through the above-referenced IMSI number, and to any other IMSI number accessed through the target telephone number referenced above, within the thirty day period. The authorization is also intended to apply to the target telephone number referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephone while the telephone is off the hook or otherwise in use.

10.     As a result of my personal participation in this investigation and reports made to me by other law enforcement offficers, and information obtained from confidential sources, I am familiar with all aspects of this investigation. On the basis of this familiarity, and on the basis of other information that I have reviewed and determined to be reliable, I declare that the facts contained in this affidavit show that:

---

[2] Although aiding and abetting under 18 U.S.C. § 2 is not a predicate offense for Title III interception enumerated in 18 U.S.C. § 2516, there also is probable cause to believe that the TARGET SUBJECTS of the investigation have aided and abetted and are aiding and abetting the enumerated substantive offenses.

4

a. There is probable cause to believe that the TARGET SUBJECTS, and others yet unknown, have committed, are committing, and will continue to commit violations of the TARGET OFFENSES.

11. Additionally, based upon the investigation in this case, there is probable cause to believe the following.

    a. Particular wire communications of the TARGET INTERCEPTEES and others yet unknown, concerning the TARGET OFFENSES, will be obtained through the interception of wire communications occurring to and from the TARGET TELEPHONE; and

    b. The communications will likely identify and provide admissible evidence concerning:

        i. The TARGET OFFENSES

        ii. The names, telephone numbers, and locations of the TARGET SUBJECTS, their associates, their drug suppliers (both domestically and potentially internationally), their workers, and other types of co-conspirators

        iii. The leadership of the drug trafficking organization ("DTO")

        iv. The dates, times, and places for commission of the illegal activities

        v. The location, receipt, administration, control, management, and disposition of the DTO's illegal narcotics, firearms, assets, and other materials

        vi. The nature, scope, places, methods of operation; and

        vii. The existence and location of records documenting the business of the DTO.

12. Normal investigative procedures have been tried and have failed, appear unlikely to succeed if tried, or are too dangerous to employ, as described herein in further detail.

5

### III. Basis of Information

13.    I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

   a.   My experience investigating crimes generally, and drug trafficking offenses specifically; as well as the experience of other law enforcement officers and agents;

   b.   Oral and written reports, and documents about this investigation that I have received from members of local and federal law enforcement agencies, and other law enforcement agencies and databases;

   c.   Physical surveillance and video surveillance conducted by law enforcement;

   d.   Confidential sources;

   e.   Public records;

   f.   A review of pen register information, cellular telephone toll records, cellular telephone geolocation information, caller identification information, and cellular telephone subscriber information;

   g.   Consensually recorded and documented calls and text messages;

   h.   Controlled drug purchases from some of the target interceptees;

   i.   Text Message Search Warrants;

   j.   Geo-location search warrants;

   k.   NCIC criminal history reports;

   l.   Other investigation.

14.    Because this Affidavit is being submitted for the limited purpose of securing authorization for the interception and recording of the requested wire communications, I have not included each and every fact known to me concerning the ongoing investigation. I have presented only the facts

6

that I believe are essential to establish probable cause for an order authorizing the interception and recording of wire communications described in this Affidavit.

## IV. BACKGROUND ON TARGET INTERCEPTEES AND SUBJECTS

15. Information about the TARGET INTERCEPTEES and TARGET SUBJECTS comes from the non-exhaustive list of information delineated above in the "Basis for Information" paragraph.

16. Through review of all of this information, and based on what law enforcement knows now, the following TARGET SUBJECTS have been identified:

a. LOPEZ is a source of supply for cocaine and other drugs in the Eastern District of Tennessee. He is also the leader of a group of individuals distributing cocaine and other drugs in the Eastern District of Tennessee. As noted below, he organized the sale of cocaine to a law enforcement confidential source. He has no known pending charges.

b. MARTINEZ sells cocaine in the Eastern District of Tennessee, and works directly with/for LOPEZ. As noted below, MARTINEZ has sold cocaine to a confidential source on multiple occasions. MARTINEZ was previously deported in 2013, but has no known criminal convictions.

c. MARIO is a Texas based supplier of kilogram quantities of cocaine who also transports the cash proceeds from drug sales back to Texas. As noted below, MARIO communicated with NOLVIA regarding the sale of multiple kilograms of cocaine in Texas to NOLVIA and JOBANI, and later supplied those kilograms of cocaine. MARIO has no listed criminal history, but money laundering charges may be pending in Louisiana.

d. RAMIREZ is a Texas based supplier of kilogram quantities of cocaine. As noted below, he was twice involved in traffic stops where large amounts of cash were seized from

7

vehicles in which he was traveling. He supervises MARIO. RAMIREZ has no criminal convictions but a money laundering charge in Texas is pending. RAMIREZ is also facing deportation proceedings.

e.    TULIO is a courier for the MARIO/RAMIREZ/LOPEZ DTO. TULIO recently lived in the Eastern District of Tennessee but was deported to Mexico after he was discovered riding in a vehicle with a large amount of cash, in a traffic stop noted below. Tulio is pending money laundering charges in Texas. He was also recently deported.

f.    JOBANI is a cocaine distributor based in the Eastern District of Tennessee. He worked with NOLVIA and MARIO to arrange the sale of kilograms of cocaine in Texas and subsequent transportation of the cocaine back to the Eastern District of Tennessee.

g.    NOLVIA was caught after a traffic stop carrying a small amount of cocaine. After her stop, NOLVIA agreed to speak with law enforcement after this stop and admitted that she was involved in picking up and transporting kilograms of cocaine from Texas, purchased from MARIO, back to the Eastern District of Tennessee. NOLVIA has been previously deported and has a prior 2018 felony drug possession/sale conviction in the State of Tennessee. Felony Tennessee state drug possession charges are currently pending against NOLVIA.

## V.    Prior Applications

17.    Based upon electronic surveillance (ELSUR) record checks of the DEA, ATF, Immigration Customs Enforcement (ICE), and FBI indices on or about November 17, 2020, there have been no other federal applications for an order authorizing or approving the interception of wire, oral, or electronic communications to or from TARGET TELEPHONE or of any of the TARGET SUBJECTS specified in this Affidavit.

8

## VI. FACTS ESTABLISHING PROBABLE CAUSE

18.    In this affidavit, I seek permission to initiate the interception of wire communications over the TARGET TELEPHONE.

*Background*

19.    Local county law enforcement officers were investigating several cocaine dealers in Sevier County, Tennessee beginning in the Spring of 2020.  Local officers kept Federal law enforcement informed about their investigation, and federal agents of the FBI and other federal agencies took over the investigation in late August of 2020 after NOLVIA told law enforcement she picked up kilogram quantities of cocaine in Texas.

20.    On April 30, 2020, a confidential source ("CS"), CS1[3], who was working with law enforcement in Sevier County, Tennessee purchased approximately 2 grams of cocaine from MARTINEZ in an audio/video controlled buy in the Eastern District of Tennessee. CS1 knew the cellphone number for MARTINEZ, 865-621-8408 ("MARTINEZ PHONE") which CS1 used to call MARTINEZ and to set up this cocaine deal.  Law enforcement observed the CS1 speaking with MARTINEZ, who was using the MARTINEZ PHONE, and the call was recorded.

21.    On May 12, 2020, CS1 purchased approximately 2 grams of cocaine from MARTINEZ in an audio/video recorded controlled buy on behalf of law enforcement in the Eastern District of Tennessee.  CS1 told law enforcement that he called MARTINEZ on the MARTINEZ PHONE to setup this deal, and the call was neither recorded nor observed by law enforcement.

---

[3] CS1 initially agreed to work off a traffic ticket and fines. After, the source has agreed to continue to work for the prospect of remaining in the United States. His work with law enforcement began on or about 11/1/2019. He has almost no criminal history, which includes only a traffic citation. Law enforcement considers CS1 to be a reliable source of information. In this case, however, his work was carefully supervised and corroborated by actual recordings and observations by law enforcement officers. The source is considered to be credible and reliable by law enforcement.

9

22.    On June 8, 2020, CS1 purchased approximately 2 grams of cocaine from MARTINEZ in an audio/video recorded controlled buy on behalf of law enforcement in the Eastern District of Tennessee. Prior to the controlled buy, CS1 called MARTINEZ on the MARTINEZ PHONE to setup this deal. One of the calls to set up the deal occurred while law enforcement observed, which was not recorded.

23.    On or about July 9, 2020, CS2,[4] at the direction of local law enforcement, contacted LOPEZ to arrange a purchase of cocaine in the Eastern District of Tennessee. CS2 told law enforcement that LOPEZ was the biggest drug dealer that he knew of in the area, and agreed to work with law enforcement to arrange a controlled buy with LOPEZ. CS2 knew he could contact LOPEZ on the TARGET TELEPHONE. CS2 then worked with law enforcement and contacted LOPEZ seeking to buy 8 grams of cocaine for $500. The deal was planned with law enforcement for July 9, 2020.

24.    Toll records show that LOPEZ, using the TARGET TELEPHONE, and CS2 communicated several times on July 9, 2020 prior to when CS2 met with law enforcement to get audio and video recording equipment for the controlled by later that day. Before the deal happened, audio and video equipment captured LOPEZ and the CS2 speaking over the phone at approximately 3:55pm. CS2, as he had been told by law enforcement to do, placed the call on speaker phone so that the call could be recorded on audio/video equipment in CS2's vehicle. Following the deal, CS2 showed his phone to law enforcement who confirmed that the call was made to LOPEZ,

---

[4] CS2 initially agreed to work with law enforcement after a DUI arrest. His work with law enforcement began on or about 5/26/2020. The CS2 worked for law enforcement with the hope of a reduced charge, and/or sentence. The CS2 has a history of traffic violations and his DUI conviction was reduced to reckless endangerment. CS2 told law enforcement that he had previously bought cocaine from LOPEZ. Law enforcement considers CS2 to be a reliable source of information, but in this case all of his information was verified and/or fully corroborated through independent law enforcement observation and the recording of his conversation with LOPEZ. The source is considered to be credible and reliable by law enforcement.

10

who was using the TARGET TELEPHONE, which matches toll records that show the TARGET TELEPHONE communicating with CS2 at the same time. The following is a translation of the recorded call between CS2 and LOPEZ[5]:

| | |
|---|---|
| CS2: | hello, hello, hello |
| CS: | oh |
| LOPEZ: | hello |
| CS2: | Hey Juan, I'm in a white Escalade, old man, a Cadillac Escalade old man, white one |
| LOPEZ: | Ok old man, you're in ("inaudible"), ok they are passing the Food City, they'll be there now |
| CS2: | Alright bro I'm here just tell them to come in here in my Escalade come in my Escalade |

...

| | |
|---|---|
| LOPEZ: | Um Um are you going to do the party or what asshole |
| CS2: | Alright bro, well I don't know if I should do it at my house bro, but I also don't want to, you know, it forms a mess… |
| LOPEZ: | Not everyone is going, not everyone is going |
| CS2: | Yes, no it's better I rent a fuckin cabin, and there are several ones with 17 rooms about 10 rooms, some with 5 floors. I also don't want all the fuckin, I also don't want all the county bro, only the cool people, you understand, only us bro |
| LOPEZ: | (inaudible) |
| CS2: | Alright old man thanks Juan |

25.    Based on my training and experience, as well as the context of the call within this investigation, I believe that during this call CS2 told LOPEZ she/he was ready to make the cocaine deal and was waiting at the pre-determined location ("Hey Juan, I'm in a white Escalade, old man, a Cadillac Escalade old man, white one). LOPEZ then told CS2 that his subordinates or drug couriers were on their way to complete the cocaine deal with CS2 ("they are passing Food City, they'll be there now"). Based on my training and experience as well as other aspects of the investigation, I believe the LOPEZ then shifted the conversation to discuss a possible upcoming party with CS2. CS2 expressed reluctance to have the party at his house ("I don't know if I should do it at my house bro…it forms a mess") and stated that its better to simply have a party at a large

---

[5] This recorded conversation was in Spanish and was translated into English by a fluent speaker of both languages.

cabin ("it's better I rent a fuckin cabin, and there are several ones with 17 rooms, about 10 rooms, some with 5 floors") and that he didn't want a large gathering ("I also don't want all the county bro, only the cool people").

26.    A short time after CS2's call with LOPEZ, MARTINEZ and two unknown males arrived in a vehicle at the location where LOPEZ and CS2 had agreed to do the cocaine deal. Law enforcement was positioned nearby to observe the deal occur. MARTINEZ spoke with CS2 and gave CS2 his cell-phone number, the MARTINEZ PHONE number. LOPEZ did not show up to the deal with CS2. CS2 received approximately 8 grams of cocaine in this deal and paid $500 for the 8 grams. After the deal was completed, law enforcement followed MARTINEZ and the two unknown males after they left the cocaine deal location. MARTINEZ and the unknown males drove to a nearby parking lot where they met with LOPEZ, who was sitting in his car. Law enforcement observed one of the individuals that had delivered the drugs to CS2 hand something to LOPEZ. Law enforcement believes, based on their training and experience as well as the context within this investigation, that LOPEZ was handed the cash proceeds of the drug sale to CS2 that had just occurred.  LOPEZ was then followed by law enforcement back to a mobile home located at 3023 Bryan Road, Lot 26, Kodak, Tennessee, hereinafter the "LOPEZ STASH HOUSE." LOPEZ has been spotted by law enforcement surveillance at the LOPEZ STASH HOUSE[6] on several occasions since July of 2020.

27.    According to toll records, on July 9, 2020, the same day as the above-mentioned controlled drug buy, MARTINEZ using MARTINEZ PHONE, and LOPEZ using the TARGET

---

[6] As noted later in this affidavit, a photograph with imbedded geo-location metadata indicating that it was taken in the LOPEZ STASH HOUSE, showed what appeared to law enforcement to be a large amount of cocaine.  This photograph was on NOLVIA's phone.  LOPEZ has been frequently spotted by law enforcement surveillance at this location.

12

TELEPHONE, were in frequent communication. Toll records demonstrated approximately 23 instances of communication between MARTINEZ and LOPEZ on July 9, 2020.

28. On July 22, 2020, CS1 purchased approximately 4 grams of cocaine from MARTINEZ in an audio/video recorded controlled buy on behalf of law enforcement within the Eastern District of Tennessee. CS1 called MARTINEZ on the MARTINEZ PHONE to setup this deal, this call was recorded and done in front of law enforcement.

29. On July 22, 2020, while the deal described above was planned and executed, MARTINEZ, using the MARTINEZ PHONE, and LOPEZ, using the TARGET TELEPHONE, were in frequent communication. According to tolls records, they communicated 8 times on July 22, 2020.

30. On or about August 18, 2020, NOLVIA[7] was stopped by local law enforcement officers in Sevier County, Tennessee. Law enforcement discovered approximately 2 grams of cocaine and $1,966 in cash in her purse. NOLVIA, who is not a legal resident of the United States, agreed to speak with law enforcement. NOLVIA told law enforcement that she worked with someone named "Giovanni" (listed in her phone as "Jobani Culmi") to purchase kilogram quantities of cocaine from someone named MARIO in Texas. After purchasing the cocaine in Texas, NOLVIA told law enforcement that they then drove the cocaine back to Tennessee. NOLVIA stated that JOBANI paid $32,000 for the cocaine, while NOLVIA was paid approximately $1,000 for riding with JOBANI to Texas and back. NOLVIA consented to law enforcement searching her phone. One of

---

[7] NOLVIA, after her arrest for the possession of cocaine, was working with law enforcement with the likely goal of reducing any charges and/or sentence, as well as potentially avoiding deportation. The information NOLVIA provided on MARIO was considered trustworthy and reliable, in part because her information was fully corroborated through messages and photographs on her phone as well as subsequent law enforcement investigation. However, NOLVIA is not considered a reliable source of information as it relates to LOPEZ. LOPEZ drove NOLVIA to one meeting with law enforcement and travel records indicate LOPEZ and NOLVIA may have traveled to Texas together. As such, NOLVIA may be in a close professional or personal relationship with LOPEZ. Law enforcement believes that NOLVIA is protecting LOPEZ because she has tried to avoid talking about LOPEZ during her conversations with law enforcement and has steered the conversation away from LOPEZ when his name has come up.

the text message conversations in NOLVIA's phone was with MARIO, who was using 214-972-8501 ("MARIO PHONE 1"). On or about August 14, 2020, NOLVIA and MARIO, using MARIO PHONE 1, had the following text message exchange[8]:

> NOLVIA told MARIO "they want 2"
>
> MARIO responded to NOLVIA "let me ask"
>
> NOLVIA texted MARIO to ask "if they can get 3 can they get a better price"
>
> MARIO responded with a thumbs up

31.   Based on my training and experience, as well as the context within this case, I believe that during the above conversations, MARIO and NOLVIA were arranging a kilogram quantity sale of cocaine. NOLVIA told MARIO she wanted to buy "2" kilograms or half kilograms of cocaine and asked if they could get a better price if they bought three ("if they can get 3 can they get a better price"). MARIO confirmed that if they bought more cocaine, they would get a better price by responding with a thumbs up.

32.   Law enforcement found a photograph on NOLVIA's phone that showed a large amount of a white powdery substance that she told law enforcement was cocaine. This photograph, according to geo-location meta-data attached to the photograph, was taken at the LOPEZ STASH HOUSE on or about August 15, 2020. The photo was taken approximately 1 day after NOLVIA's conversations with MARIO about purchasing several kilograms of cocaine as noted above on or about August 14, 2020.

33.   Law enforcement investigation, including through tolls records, toll analysis, recorded calls, and subscriber data, learned that MARIO appeared to use at least 4 different phones since August of 2020. Tolls records also indicate that before MARIO dropped MARIO PHONE 1 and began using different phone numbers, he had multiple conversations with LOPEZ. For example, toll

---

[8] This conversation was originally in Spanish, and was translated by a fluent speaker of English and Spanish.

records show that MARIO, using MARIO PHONE 1, and LOPEZ, using the TARGET TELEPHONE, communicated 11 times since approximately June of 2020, including most recently a call on or about August 14, 2020.

34.     In my training and experience, I am aware that Texas is a source area for illegal drugs, including cocaine, that flow into the Eastern District of Tennessee for distribution to users. I am also aware that drug traffickers frequently discuss prices and weights without actually naming the specific drug that is being negotiated for sale. Indeed, it would be rather unusual for a drug trafficker to explicitly state that the item being purchased was cocaine or another drug. Finally, I'm aware that when drug traffickers sell drugs, they will often offer a lower price per kilogram or gram when larger quantities are purchased at once, which allows the seller to earn a larger profit for the same risk of law enforcement discovery or worse. In light of all of the evidence in this case, coupled with my training and experience, I believe that LOPEZ· is involved in the ongoing distribution of kilogram quantities of cocaine in the Eastern District of Tennessee.

35.     There is also evidence that this DTO is driving bulk cash proceeds from drug sales back towards Texas and the border. MARIO was tied to two seizures totally $185,000 found hidden in vehicles traveling to and in Texas. For example, MARIO was involved in a traffic stop in the Western District of Louisiana on or about June 15, 2020. MARIO and RAMIREZ were the occupants in a vehicle traveling westbound on an interstate highway towards the state of Texas, in western Louisiana. They told law enforcement that they were returning from Pigeon Forge, Tennessee, in Sevier County, which the same County where LOPEZ, MARTINEZ, and NOLVIA live and operate. During that traffic stop, law enforcement discovered approximately $84,000 in cash and approximately 249 grams of what law enforcement believes is marijuana. The cash was hidden in a box and in the side panels of the vehicle. The marijuana was hidden in a cutout spare

tire. MARIO and RAMIREZ denied knowing about the money or marijuana in the car. After this traffic stop, both MARIO and RAMIREZ were cited by local authorities with misdemeanor possession of marijuana. The report from this arrest lists money laundering charges for MARIO and RAMIREZ as "pending" with the local district attorney's office. Both were released from custody. No charges are listed pending in NCIC, so MARIO and RAMIREZ may not face felony criminal charges from this stop.

36.     On or about August 26, 2020, near Huntsville, Texas, local law enforcement conducted a traffic stop on a vehicle with two passengers. RAMIREZ again, was one occupant, and the other occupant was TULIO. TULIO was listed in the police report as from Sevierville, Tennessee. Hidden inside the vehicle, law enforcement discovered approximately $101,000 in cash. Both TULIO and RAMIREZ denied knowing about the hidden money in the vehicle. Both occupants were charged with Money Laundering by local authorities in Texas and those charges are pending. Both were later detained by federal officials for deportation because they were not lawfully in the United States. TULIO was later deported. RAMIREZ has been released from custody pending deportation because of health concerns.

37.     While they were detained awaiting deportation after their traffic stop on August 26, 2020, both TULIO and RAMIREZ spoke with MARIO over recorded prison telephone lines. MARIO, as noted elsewhere, was in communication with NOLVIA about the sale of kilogram quantities of cocaine right before NOLVIA took a picture in the LOPEZ STASH HOUSE of a large amount of white powdery substance that she told law enforcement was cocaine. As noted earlier, LOPEZ himself was in contact with MARIO PHONE 1, a phone used by MARIO, before MARIO switched to new telephone numbers. And as noted elsewhere, LOPEZ himself dropped NOLVIA off at the police station so that she could speak with law enforcement.

16

## VII.  ANALYIS OF TELEPHONE RECORDS

<u>TARGET TELEPHONE</u>

38.     On October 22, 2020, United States Magistrate Judge Debra Poplin authorized a pen/trap and trace device on TARGET TELEPHONE, which began collecting data on October 29, 2020, and is still currently active. Pursuant to subpoenas, law enforcement obtained toll records for TARGET TELEPHONE from March 1, 2020 to October 28, 2020. Thus, law enforcement possesses call and text message history for TARGET TELEPHONE from March 1, 2020 to November 16, 2020, which is "the covered period."

39.     During the covered period, records show that 15,920 calls were placed to and from TARGET TELEPHONE. The most recent call was on November 16, 2020.

40.     During the covered period, 476 calls occurred between MARTINEZ PHONE and TARGET TELEPHONE.  The most recent occurred on November 16, 2020.

### VII.  Need For Interception

41.      Based on my training and experience, the experience of other law enforcement officers involved in this investigation, and all the facts set forth herein, it is my belief interception of wire communications over the TARGET TELEPHONE is the only available investigative technique that has a reasonable likelihood of achieving the goals of this investigation, which include:

      a.  The dismantling of the DTO through lawful prosecution and conviction of its members, leaders, and suppliers.

      b.  Identification of all significant contributors to the DTO.

      c.  Collection of evidence sufficient to prosecute all significant contributors to the DTO.

      d.  Seizure of narcotic shipments before they reach users.

17

e.  Identification of the sources of supply for the DTO including sources of the supply that may be outside the DTO.

f.  Collection of evidence sufficient to prosecute the DTO's sources of supply, including any international suppliers and co-conspirators.

g.  Collection of evidence sufficient to prosecute and seize proceeds of the DTO's drug transactions, bulk cash smuggling efforts and/or money laundering efforts.

42.     Based on my training and experience, it is my belief that the interception of wire communications, in conjunction with the other investigative techniques currently being used in this investigation, is the only available technique that has a reasonable likelihood of identifying the entirety of the DTO, to include all sources of supply who are believed to be based in or near Florida, Texas, and in Mexico.  It is my belief that the interception of wire communications, as detailed herein, is the only available technique with a reasonable likelihood of securing the evidence sought, which is necessary to prove beyond a reasonable doubt the participation of all of the co-conspirators involved in the DTO, to identify all co-conspirators, and to identify the sources of supply. Numerous investigative procedures typically employed in an investigation of this type have been tried and have failed, reasonably appear to be unlikely to succeed if they tried, or are too dangerous to employ.

**Counter Surveillance**

43.     Important for several sections below, LOPEZ and other members of the DTO use counter-surveillance techniques.  For instance, we know that LOPEZ frequently changes the car that he is driving.  Law enforcement observed through electronic and physical surveillance that LOPEZ left the Eastern District of Tennessee on multiple occasions in the past few months to travel to other areas such as Florida and Texas. When LOPEZ has been observed back in the Eastern District of

18

Tennessee, he was spotted driving new vehicle after his return, that are registered to him. Shortly after arriving back into the district, LOPEZ has then been spotted meeting with a local county employee in order to change the tags and registration on the new vehicles to someone else's name, even though LOPEZ has been spotted continuing to drive the new vehicle. Toll records and subscriber data strongly suggest to law enforcement that LOPEZ is using multiple phones, in addition to the TARGET TELEPHONE. Furthermoe LOPEZ has a Whatsapp account, which is an end-to-end encryption application on smart phones that can be used to have secure conversations about innocent or illegal activity. Based on my training and experience, I know that drug traffickers frequently use end-to-end encryption to mask their conversations from potential law enforcement surveillance. Moreover, for the July 9, 2020 sale of cocaine, described above, LOPEZ was careful not to conduct the transaction himself, but rather to send "runners" or "couriers" to drop off the drugs and bring the proceeds to him in a separate location. Based on my training and experience, this sort of behavior is designed to minimize any risk that LOPEZ himself could be caught up in any law enforcement activity surrounding a drug deal. I know that drug trafficking organization leaders frequently do not handle the sales of drugs themselves in order to reduce the chance that they themselves are caught selling drugs.

44.     MARIO has used at least 4 different telephone numbers since approximately August of 2020. For example, MARIO appears to have changed phone numbers after law enforcement activity in this case, including traffic stops in Louisiana and Texas, which are described above, and NOLVIA speaking with law enforcement. MARIO is also known to use Whatsapp.

45.     When law enforcement drove by a residence believed to be used by RAMIREZ, law enforcement observed as many as 10 or more surveillance cameras covering the exterior of the residence, making any potential surveillance or law enforcement action risky at that residence.

## Surveillance (Vehicle Trackers, Geolocation Information, Physical Surveillance, and Pole Cameras)

46.     While surveillance has been useful in accomplishing the goals of this investigation, surveillance alone cannot accomplish the goals of this investigation. For example, in this case, law enforcement has surveilled LOPEZ, MARTINEZ, and other members of the DTO. Law enforcement also attempted surveillance on possible locations used by MARIO. But law enforcement cannot discern the whole scope of the drug trafficking conspiracy, the weights and types of narcotics bought and sold, the full identities of potential co-conspirators, the roles of potential co-conspirators, sources of supply, or obtain evidence necessary to secure prosecutions for involved co-conspirators based on surveillance alone.

47.     For example, law enforcement has observed LOPEZ traveling outside the district using license plate readers and other physical surveillance on multiple occasions since August of 2020, but has not been able to learn where he was headed or why he was traveling based on this surveillance alone. While law enforcement suspects that these trips are related to the purchase of narcotics or the laundering of narcotics proceeds, surveillance alone cannot reveal the nature and purpose of these trips without a wiretap. On or about November 10, 2020 federal agents traveled to Dallas, Texas in an attempt to surveil possible locations used by MARIO, but were unable to spot MARIO, and were only able to take vehicle tag information on possible locations used by MARIO. This trip demonstrates the difficulty of using surveillance alone to conduct a drug trafficking investigation. Law enforcement has also conducted surveillance on numerous other members of the drug trafficking organization ("DTO") since August of 2020, including on MARTINEZ and others associated with LOPEZ, but this surveillance, while helpful has not accomplished the goals of this investigation.

48.     The use of vehicle-tracking devices also has been contemplated in this investigation. I

20

believe any attempt to install a vehicle tracking device carries a significant risk of detection by the DTO. Home/private use surveillance cameras are now common-place and they often have night vision capability, the ability to detect movement, record, and alert the user via mobile devices. Even if a vehicle-tracking device is successfully installed on vehicles associated with the DTO, there is no reason to believe that the movements of the vehicle would allow agents to determine who is supplying naroctics or moving money on behalf of the DTO. Despite these risks, local law enforcement placed trackers on two vehicles believed to be driven by LOPEZ. As noted above, LOPEZ frequently changes the vehicles that he drives and these attempts to track LOPEZ's movements through vehicle-trackers has not produced information sufficient to accomplish the goals of this investigation, despite the risky nature of placing these trackers. For example, on vehicle tracked by law enforcement was later found abandoned. As such, while law enforcement has seriously considered further use of vehicle trackers, at this time, law enforcement believes that the potential investigative benefits of the use of these trackers is minimal and is outweighed by the potential for discovery or dangerous encounters while placing the trackers. For the reasons described above, I believe placing a tracker on this vehicle could be dangerous, reveal our investigation, and would yield little new critical information.

49.     Law enforcement is using geo-location phone tracking in this investigation. For example, law enforcement sought federal search warrants for the geo-location of phones used by MARIO on three occasions since August of 2020. Law enforcement attempted, through a federal search warrant, to locate MARIO PHONE 1, but MARIO dropped this phone before it could be located. Law enforcement then attempted, through another federal search warrant, to locate another phone (MARIO PHONE 3) believed to be used by MARIO, but that phone too had been turned off or dropped by MARIO and yielded no geo-location information. Finally, law enforcement, through

a third federal search warrant, obtained geo-location information on MARIO PHONE 4, believed to be used by MARIO, and this information was used to locate MARIO in the general area of Dallas, Texas, and the surrounding areas. However, the "pings" from this federal search warrant are not especially accurate, with an accuracy that is often approximately limited to a $500 - 3000$ meter range. This limitation on geo-location information obtained from MARIO PHONE 4 means that law enforcement cannot accomplish the goals of this investigation through the use of this information alone. Indeed, at those low accuracy levels, it is hard for law enforcement to even find where MARIO is actually located beyond a generalized area. This is true also for historical cell-site data, which only tells law enforcement what tower and tower face was used by a cellphone at a historical point in time. Law enforcement obtained this data for MARIO PHONE 4, but this information has been useful mainly to place MARIO in a general area historically. Law enforcement intends to seek similar geo-location information for LOPEZ and the TARGET TELEPHONE in the near future. But I do not believe that this information, alone can accomplish the goals of this investigation. For example, while this information is useful, law enforcement cannot determine what MARIO or LOPEZ are doing in identified locations, who they are meeting with, why they traveled to the locations in question, or with whom they are meeting or working with at the time. Agents also don't learn the breadth of the DTO, who the key players are, or the manner and means by which they control the flow of drugs and money from this sort of surveillance. There are also serious limitations to GPS phone tracking. If phones are turned off or frequently dropped, agents often have no ability to track MARIO, LOPEZ, or other members of the DTO. Thus while geo-location trackers are helpful, they have real limitations and do not accomplish the goals of this investigation on their own.

50. Law enforcement has used a pole camera on the LOPEZ STASH HOUSE. This pole camera has yielded some important information, including when cars and individuals arrive at the LOPEZ STASH HOUSE. LOPEZ, MARTINEZ, and NOLVIA have been spotted at the LOPEZ STASH HOUSE. When the pole camera is monitored, law enforcement can usually discern if a known person enters or exits the property, and can often read a license plate on vehicles entering or exiting the property. But this information alone cannot accomplish the goals of this investigation. For example, the pole camera does not reveal why a person or vehicle is at the LOPEZ STASH HOUSE, or what is occurring inside the property, overhear conversations on or in the property, or what was carried to and from the property. Nor can the pole camera identify the roles of any potential co-conspirators, the weights or types of narcotics being bought and/or sold, or identify the DTO's sources of supply. There are also significant risks associated with the use of pole cameras. In one recent investigation, I am aware that the pole camera was spotted, and a photograph of the pole camera was placed on social media.

51. In summary, while surveillance has been seriously considered and repeatedly attempted, surveillance alone cannot accomplish the goals of this investigation where the target DTO is using cellphones to conduct its business.

### Confidential Sources

52. This investigation has heavily used confidential sources in an effort to penetrate the DTO. As noted above, CS1 and CS2 were used to purchase narcotics from MARTINEZ and LOPEZ. But these confidential sources have not had access to the inner working of the DTO, and they do not know the identities of any sources of supply, or the full breadth of the DTO's activities. Based on the information provided by these confidential sources, they are not able to learn or otherwise get access to information such as the full scope of the DTO's activities, their sources of supply,

the weights of narcotics bought and sold by the DTO, or the identities of all of the DTO's co-conspirators. The leadership structure of this DTO appears, as noted above, to isolate itself from hand-to-hand drug sales, which in my training and experience is not uncommon. Furthermore, the confidential sources can only buy from lower level members of the DTO, and LOPEZ has stopped communicating with at least one of the confidential sources, CS2. CS1 does not have access to LOPEZ or other members of the DTO's leadership. NOLVIA has served as a source of information in this case. NOLVIA gave an extensive interview with law enforcement in which she detailed her interactions with MARIO and other members of the DTO. NOLVIA also permitted law enforcement to search her phone. This information was extremely useful in this investigation but also had many limitations. One such limitation is that NOLVIA did not know the identity of MARIO, or have pictures of MARIO. Based on toll records, and pen/trap data, NOLVIA is not believed to be still be in communication with MARIO, and may have been cut off by other members of the DTO as well. For example, LOPEZ himself, drove NOLVIA to a follow-up interview with law enforcement in or around October of 2020. NOLVIA has also not provided any information on LOPEZ, possibly because LOPEZ and her have a professional and/or personal relationship based on information developed by law enforcement, including surveillance and toll records. As such, while the use of confidential sources and the interview with NOLVIA in this case has been helpful to accomplishing the goals of this investigation, the use of confidential sources and information provided by NOLVIA alone cannot fully accomplish the goals of this investigation.

53.    Interviews of subjects and their associates have been limited to persons already arrested or persons who have sought to cooperate with law enforcement in this investigation. Those persons have been identified in this affidavit as CS1, CS2, and NOLVIA. Based on my experience and the

experience of other agents in conducting investigations of persons involved in drug trafficking, it is my belief that if interviews were attempted of people not arrested, the individuals contacted would alert their co-conspirators of federal law enforcement interest in their activities, causing them to flee or resulting in the possible concealment, movement, or destruction of documents, drugs, monies, and/or other evidence, which would make it more difficult for sufficient evidence to be obtained to identify and prosecute them. As such, while law enforcement has seriously considered further interviews of individuals involved in this investigation, law enforcement believes that the risks of this technique outweigh the potential benefits, and cannot, by itself, accomplish the goals of this investigation.

## Undercover Agents

54.     Based on my training and experience, as well as this investigation, I do not believe that an undercover law enforcement agent could penetrate this DTO or fully accomplish the goals of this investigation. This DTO appears to work primarily with other Hispanic males and females they have established relationships with, over the course of many months or years, and as such, I do not believe that an undercover agent could acquire meaningful access into the DTO. By its very nature, the use of an undercover law enforcement officer is extremely dangerous, and if the undercover officer is discovered, serious harm could befall that officer. I believe that any undercover officer would be regarded as highly suspicious and unlikely to learn any information from LOPEZ, MARIO, or other members of the DTO. Even if an undercover agent could potentially make a buy from the DTO of a few grams of cocaine or another drug, such a buy would yield little new information about the DTO, and fall far short of accomplishing the goals of this investigation. As such, I believe that the risks of using an undercover agent far outweigh any potential benefit, and cannot, by itself accomplish the goals of this investigation.

## Consensual Monitoring

55.     NOLVIA allowed law enforcement to look through her phone and messages. But NOLVIA appears to be loyal to LOPEZ, as she has not mentioned him, and LOPEZ himself drove NOLVIA to a meeting with law enforcement. As such, law enforcement is extremely worried that any questions about LOPEZ or an effort to use NOLVIA to investigate LOPEZ would lead to NOLVIA alerting LOPEZ that there is a federal investigation into him. As noted elsewhere, NOLVIA is not believed to still be in contact with MARIO.

56.     CS1 and CS2 consented to the monitoring of their calls before low-level drug purchase deals with members of the DTO. But the information gleaned from NOLVIA and the confidential sources did not accomplish the goals of this investigation, identify the DTO's sources of supply, methods of laundering proceeds, the leadership structure of the DTO, or identify all members of the drug trafficking conspiracy. Furthermore, there is the risk that any cooperator may, at any time, alert LOPEZ or MARIO of law enforcement's interest in their operations, and permit them to destroy evidence, alter his operations, and thwart this investigations goals. As such, while the use of the consensually recorded calls has been useful, it has not, and cannot fully accomplish the goals of this investigation.

## Trash Pulls

57.  An investigative technique that sometimes provides useful evidence is a "trash pull" or the collection and examination of discarded trash at a subject's business and/or residence. Law enforcement attempted a trash pull on August 17, 2020, from an address where MARTINEZ was spotted by law enforcement surveillance. This trash pull did not yield any useful information or evidence. Law enforcement has considered a trash pull on the LOPEZ STASH HOUSE, but the LOPEZ STASH HOUSE is a trailer in a crowded trailer park, that utilizes a community trash bin.

26

As such, it would be difficult or impossible to isolate trash from the LOPEZ STASH HOUSE from the trash from other trailers in the area. There is also a significant risk that law enforcement agents digging through the community trash in a crowded trailer park would be identified and the investigation jeopardized by the use of this technique. Based on my training and experience, even when law enforcement can pull trash from a suspicious address, the information and evidence yielded is not sufficient to fully accomplish the goals of this investigation. For example, trash pulls might be expected to yield discarded mail, notes, or drug wrappings. Trash pulls are unlikely to fully identify co-conspirators, the methods a DTO uses to operate, or the DTO's sources of supply. Law enforcement has been unable to identify, with any certainty, locations from which MARIO operates, as such, cannot attempt a trash pull at this time. A trash pull has been considered at a home believed to be used by RAMIREZ, but that home appears to be heavily monitored by cameras.

**Mail Covers**

58.     Mail covers are a service provided by the United States Postal Service (USPS), wherein a list of all sender and receiver names and addresses on each piece of mail received at a particular location can be obtained. The list is compiled by the mail carrier who would deliver the mail to the target location and then a list would be provided to the United States Postal Inspector who would provide the list to agents. Based on present information, the DTO transports drugs and money in vehicles and not the mail. Therefore, agents do not believe that mail covers would be beneficial in identifying DTO co-conspirators or sources of supply of other illegal drugs. As such, while law enforcement has seriously considered the use of  mail covers, I believe that in this investigation, a mail cover would yield little information, by itself, and without a wiretap, that

could uncover the meaning of the mail coming into those locations, the contents of that mail, or otherwise fully accomplish the goals of this investigation.

## Grand Jury Subpoenas

59.   Based on my experience, training, and conversations with Assistant United States Attorney Kevin Quencer, who has considerable experience prosecuting the federal drug laws, I believe that subpoenaing persons suspected of being involved in this conspiracy, or their associates, would be unsuccessful in achieving the stated goals for this investigation. Many of the conspirators are not fully identified. Furthermore, conspirators brought before the grand jury would most likely invoke their Constitutional rights against self-incrimination and to the existence of the investigation. This would cause the targets to become more cautious in their activities, flee to avoid further investigation or prosecution, or threaten the lives of confidential sources or others falsely suspected of cooperating.

60.   Agents are planning to utilize subpoenas for bank records in order to investigate possible money laundering activity and to locate the proceeds of the DTO's drug trafficking. But this information alone, once known, cannot fully accomplish the goals of this investigation. Based on my training and experience, Mexico supplied drug trafficking organizations such as this one, primarily use bulk-cash smuggling to transport proceeds back to border areas, and do not use the formal banking system for their laundering efforts. This has born out in this case, where two seizures of cash proceeds from vehicles with passengers tied to this DTO, were seized as noted above in Louisiana and Texas. As such, while bank records and other financial information obtainable through grand jury subpoenas may ultimately be useful in this investigation, I believe that these techniques, cannot alone fully accomplish the goals of this investigation.

28

61. Agents have also utilized dozens of administrative subpoenas to learn the subscriber information of telephones involved in this investigation, included the TARGET TELEPHONE, and phones used by MARIO and other co-conspirators, as well as toll records for phones suspected of involvement in this DTO. These phone records, while useful to understand the communication patterns of the members of the DTO cannot fully accomplish the goals of this investigation. For example, tolls records do not identity the users of the various telephone contacts, detail the nature of the communications, provide evidence sufficient for prosecution, or otherwise accomplish the goals of this investigation. Various members of this DTO appear to have registered telephones that they use in fictional names or the names of other persons not involved in the DTO, and this comports with my training and experience. As such, I do not believe that the use of subpoenas in this case can fully accomplish the goals of this investigation.

### Subject Interviews

62. Based on my experience and the experience of other agents and officers working on this investigation, I do not believe further interviews of subjects or their known associates would produce sufficient information about the DTO, including the source of drugs, the financing of drug purchases, and the transshipment of cocaine and other drugs into our district or around the United States at this time. I know through being involved in other drug investigations that, when confronted, subjects minimize their own involvement and protect others. Most concerning, the interviewed subjects would likely alert other DTO members, thereby compromising the investigation and resulting in the possible destruction or concealment of evidence or potentially placing cooperators in danger.

63. As a general matter, it would be unwise to risk jeopardizing this investigation based on the unpredictable actions of co-conspirators. The risks associated with confronting co-conspirators

about the DTO far outweigh the possible benefits. There is no way for law enforcement to know if the person approached will fully cooperate, or refuse to cooperate at all. Even if the individual agrees to be interviewed, there is no way to ensure that the information will be truthful or accurate. The individual could very well alert other DTO members, which could severely harm the investigation.

### Search Warrants

64.   Law enforcement has already executed a series of search warrants for geo-location information on various phones used by MARIO, and on two vehicle tracking warrants on vehicles used by LOPEZ. These efforts have produced some information for our investigation, including the general location vehicles possibly driven by LOPEZ, and a general location for MARIO. Law enforcement also plans on obtaining geo-location information from the TARGET TELEPHONE. As noted above, this information has serious limitations and cannot fully accomplish the goals of this investigation.

65.   Text message search warrants are often limited in their usefulness, although they are occasionally very useful. Only certain providers can actually preserve and provide text messages in such a warrant, and even these providers can only provide text messages from a relatively narrow band of time preceding the requested warrant. The TARGET TELEPHONE does not use such a provider. As such, a text message search warrant for the TARGET TELEPHONE would yield no results. Text message search warrants also cannot provide the content of end-to-end encrypted messages. Law enforcement has sought text message search warrants on phones used by JOBANI and MARIO. However, the information returned was not very useful.  In the search warrant return on a phone used by JOBANI, there were very few text messages that were not end-to-end encrypted and therefore readable. And the readable messages were not of the nature and

quality that they provided any important information for the investigation. As such, this warrant did not fully accomplish the goals of this investigation, and did not include evidence of drug sales, reveal sources of supply, or the roles of co-conspirators. A text message search warrant return on MARIO PHONE 3, believed to be used by MARIO, similarly yielded little evidence and did not fully accomplish the goals of this investigation. However, this text message information, even when obtainable, is not in real-time, and does not allow law enforcement to utilize real-time information about DTO activities to make seizures, conduct surveillance, or understand who is meeting with whom and when. In sum, text messages search warrants have been and can be helpful in other investigations, but in this case have not been very helpful. Even if successful, text message search warrants cannot, by themselves, accomplish the goals of the investigation.

66.    Approximately 2 cellphones were seized in the Louisiana traffic stop described above. Law enforcement officers in Louisiana have offered to send the downloaded cellphone data to aid in this investigation, but they have not yet been received or reviewed by law enforcement officials in the Eastern District of Tennessee. Another 3 cellphones were seized in the Texas traffic stop described above, and the data was forwarded to law enforcement in this district. Law enforcement has begun the process of searching the 3 cellphones seized in Texas pursuant to a warrant, but the conversations largely appear to be in Spanish, and thus analysis of these phones will be slower than usual. While the search of these phones will likely yield important information useful to this investigation, the search of these cellphones cannot, by itself, fully accomplish the goals of this investigation. For example, based on my training and experience, searches of cellphones do not fully identify the users of other phones communicating with the searched phones, and can only provide historical text messages and photographs. I also know that drug traffickers frequently do not like to speak openly in text messages, preferring calls or in-person meetings to discuss drug

related business. Law enforcement also does not know if these cellphones will contain any information on key targets of this investigation, including LOPEZ and others. While there is evidence that suggests that the users of the seized cellphones were related to this investigation, the nature of those contacts are still largely unknown. Thus, while the search of cellphones used by possible co-conspirators can be a useful and important tool, I do not believe, based on my training and experience, that the search of the available cell phones in this case will be sufficient to accomplish the goals of this investigation.

67.     Law enforcement has contemplated the use of search warrants to search physical locations associated with this DTO. But under the Constitution, probable cause is required before law enforcement can seek search warrants at any location. As such, law enforcement is working to develop probable cause on possible search warrant locations, but has not as of yet. Moreover, once a search warrant is executed, the investigation is revealed and any potential co-conspirators may flee or destroy evidence, or otherwise change the nature of their operations to avoid further law enforcement investigation. As such, law enforcement has seriously considered the use of search warrants on physical locations such as the LOPEZ STASH HOUSE and RAMIREZ's house, but does not believe that the rewards of such action currently outweighs the risks, nor does law enforcement have sufficient probable cause at this time.

## **Phone Toll Records**

68.     Phone toll records, analyzed pen register/trap and trace information, and other records have been analyzed in this investigation, and continue to be gathered for the TARGET TELEPHONE, and other phones used by DTO members. As noted above, toll records have been of some use in identifying numbers frequently contacted by the TARGET TELEPHONE and other DTO-associated phones. However, there are limitations to this investigative tool. These records serve

32

only to confirm contacts between telephones. Pen register/trap and trace devices only capture the telephone numbers of individuals involved in the DTO. And these pen register and toll records do not contain content of the conversations between the two parties, which is significant in the investigation of criminal conspiracies. In addition, these records do not provide the context of the conversation or the identities of the speakers. Such information is significant in the investigation of criminal conspiracies. It is known that some members of the DTO utilize communication devices not subscribed to or purchased in their names, which I believe is a method used to conceal their identities. As noted above, toll records and pen registers alone will not permit us to accomplish the goals of the investigation.

### **Financial Investigation**

69.     The financial investigation is only just beginning. It is anticipated that through the use of law enforcement databases and bank record subpoenas, coupled with the sought electronic monitoring, the financial investigation will be advanced significantly. Preliminary financial inquiries have been performed on known subjects in the DTO but have yielded limited information that cannot, by itself, accomplish the goals of this investigation. A complete and thorough financial analysis will be performed as this investigation progresses and more information of the subjects' financial standing will be revealed. Based on my training and experience, Mexico supplied and cartel linked distribution organizations, like this one, infrequently use the formal banking system, which may limit our ability to uncover the breadth and depth of financial dealings by this organization without the use of a wiretap and other investigation methods. As noted above, law enforcement has seized a large amount of cash from two vehicles case from suspected members of the DTO. These cash seizures, while helpful, have not and cannot accomplish the goals of this investigation on their own.

33

## Prison Efforts

70.     RAMIREZ and TULIO were both detained by federal law enforcement officials on immigration violations following the traffic stop in Texas on or about August 26, 2020. Before TULIO was deported, law enforcement reviewed recorded jail calls by TULIO to MARIO. Similarly, before RAMIREZ was released from custody, law enforcement reviewed jail calls by RAMIREZ to MARIO and others in the DTO. While these conversations were helpful in accomplishing the goals of this investigation, they did not provide sufficient evidence for prosecution, identify sources of supply, or otherwise reveal the full scope of the conspiracy or involved co-conspirators. Moreover, since these calls were placed from a federal detention center, the callers and recipients were aware that were recorded, and as such, the conversations were heavily coded and vague. They have also ceased since both RAMIREZ has been released and TULIO has been deported. As such, these calls alone, have not fully accomplished the goals of this investigation and cannot moving forward.

## Traffic Stops

71.     Law enforcement has utilized traffic stops and information gleaned from traffic stops to advance this investigation. NOLVIA, as discussed in detail above, provided information to law enforcement after a traffic stop. But as discussed above, this information alone cannot fully accomplish the goals of this investigation. For example, NOLVIA has provided no information as it relates to LOPEZ and appears to be in a close professional or personal relationship with LOPEZ.

72.     Local law enforcement also stopped a vehicle in Louisiana, on or about June 15, 2020, that contained hidden cash, marijuana, and MARIO and RAMIREZ. While the seizure of cash in a vehicle containing MARIO and RAMIREZ is helpful to accomplishing the goals of this

investigation, there is no evidence of where that cash came from, and MARIO and RAMIREZ denied knowing that there was cash and marijuana hidden in the vehicle. Moreover this stop did not answer crucial questions asked by this investigation, such as who supplied the marijuana found in the car, where did the cash come from, what roles MARIO and RAMIREZ play in the DTO, the identities of their co-conspirators, their relationship with LOPEZ, or how they are receiving and distributing cocaine and other drugs around the country, or where LOPEZ and others are keeping their supplies of drugs and cash proceeds. As such, this stop did not fully accomplish the goals of this investigation.

73.     The same is true for the August 26, 2020 traffic stop in Texas when a vehicle carrying approximately $101,000 was found hidden in a vehicle containing TULIO and RAMIREZ. Both TULIO and RAMIREZ denied knowing about the hidden cash and thus we do not know the source of the cash hidden in the vehicle, where they were coming from, where they were going, who they were working with, their roles in the DTO, their source of supply, their customers, or any other information about the DTO or LOPEZ. As such, while this traffic stop was helpful in this investigation, it fell well short of fully accomplishing the goals of this investigation.

**JURISDICTION**

74.     Pursuant to 18 U.S.C. § 2518(3), in the event that the TARGET TELEPHONE is used outside the territorial jurisdiction of this Court, interceptions may continue in the Eastern District of Tennessee, where communications over the TARGET TELEPHONE will first be heard and minimized.

**MINIMIZATION**

75.     All communications intercepted over the TARGET TELEPHONE will first be listened to, read, and minimized at a law enforcement facility in the EDTN. The requirements regarding the

minimization of interception will be strictly followed. Before initial interception begins, a meeting will be held for all monitoring agents and civilian contract personnel wherein the requirements of minimization will be discussed. Any monitoring agents and civilian contract personnel not in attendance will be instructed on the requirements of minimization at a later time prior to their involvement in any monitoring activity. A memorandum regarding minimization will be provided to all monitoring agents/contract personnel as well as a copy of the Order authorizing interception. A copy of that Order and a minimization memorandum will remain posted at the listening site. Before agents/contract personnel begin to intercept communications, the agents/contract personnel will be required to sign a form indicating that the agents/contract personnel have read this Affidavit, the Order authorizing interception, and the minimization memorandum and that the agent/contract personnel are familiar with the contents of the Order and will intercept wire and electronic communications in compliance with that Order. Special attention will be paid to minimizing privileged communications, including privilege marital communications, if applicable.

76.     All monitoring of wire communications will be conducted in such a way as to minimize the interception and disclosure of communications not relevant to the investigation, or otherwise criminal in nature. Monitoring of conversations must immediately terminate when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined during a portion of the conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent may spot-check to

36

ensure that the conversation has not turned to criminal matters. Special attention shall be given to minimize all privileged communications.

77.     In the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception. In the event the translator is not a federal agent, the translator, whether a language-trained support employee or someone under contract with the Government, will be under the direct supervision of a federal agent.

78.     Based on my experience and that of other agents who have monitored and supervised wire interceptions, I believe that many drug related conversations may be part of an otherwise innocent conversation. Thus, lengthy conversations that appear to be non-pertinent will be periodically monitored to determine if the conversation has become criminal in nature.

79.     As officers, deputies, investigators, and agents from state and local agencies may participate in this investigation, and their further participation would aid this investigation, it is requested that they be authorized to assist the agents in conducting this electronic surveillance, as provided by 18 U.S.C. §§ 2517(1) and 2517(2). In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

80.     All intercepted wire communications will be recorded and all recordings will be securely preserved. Computerized logs will be prepared regarding the date, time of calls/communications, the parties involved, the subject of the calls, and if and when minimization occurred. A report detailing the course of the interception will be filed with the Court on or about the fifteenth (15th)

37

day following the commencement of interception, pursuant to the Order. Particular emphasis will be placed on reporting minimization efforts as well as the need for the wire intercepts to the Court.

81.     Finally, IT IS FURTHER REQUESTED that this Affidavit, the attached Application, the resulting Order and Orders to the Service Provider, and all reports submitted pursuant to this Order be sealed until further Order of the Court.

STEFFAN HOLLIFIELD
TFO, FBI

Subscribed and sworn to before me on this November 23d, 2020.

HON. THOMAS A. VARLAN
United States District Judge
Eastern District of Tennessee

38